IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

ROGER LEMASTER                                                                                   PETITIONER

V.                              CASE NO. 5:16-CV-00035-BRW-JTK

WENDY KELLEY, *Director*
Arkansas Department of Correction                                                   RESPONDENT

## **PROPOSED FINDINGS AND RECOMMENDATIONS**

## **INSTRUCTIONS**

The following recommended disposition has been sent to United States District Court Judge Billy R. Wilson. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendations and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3. The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## **DISPOSITION**

A Lonoke County Circuit Court jury found Petitioner, Roger Lemaster, guilty of one count of rape and sentenced him to 156 months in the Arkansas Department of Correction. He filed a timely petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, and on April 15, 2016, the undersigned issued a partial recommendation to the District Judge that Lemaster's first and second claims be denied, and three of his ineffective assistance of counsel claims be denied. The Court ordered, however, that an evidentiary hearing be held on the remaining ineffective assistance of counsel claim for failing to call Becky Lemaster ("Becky") as a witness during the case-in-chief. (DE # 16) Specifically, the Court found that the state court record was "void of any trial strategy that Mr. Cannon could have had in deciding not to call Ms. Lemaster," and it held that a hearing was necessary in order to develop the record and determine whether the claim had merit. *Id.*

On June 2, 2016, the District Judge adopted in full the recommendation. (DE # 21) Subsequently, the undersigned set for hearing Petitioner's remaining ineffective of assistance of trial counsel claim for failing to call Becky as a witness. The evidentiary hearing took place on November 16, 2016, and the parties subsequently filed their post-hearing briefs. (DE # 41, 42)

The remaining issue is now ready for decision. Based on the evidence submitted at the hearing and the post-hearing briefs of the parties, it is the undersigned's recommendation that the writ of habeas corpus be denied.

## Standard of Review under *Strickland v. Washington*

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court articulated the two-part standard for analyzing claims that a criminal defendant's counsel was constitutionally ineffective: first, whether the attorney's conduct was professionally unreasonable under the circumstances; and second, whether the attorney's conduct prejudiced the defendant's defense. *Id.* at 688. An attorney's performance is deficient when it falls below "an objective standard of reasonableness." *Id*. It must be shown that counsel's errors were so serious that the criminal defendant was not afforded counsel that functioned as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.* at 687. The defendant is prejudiced by the inferior performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court held that "unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

## Discussion

Petitioner argues that his trial counsel, David Cannon, was ineffective for failing to call Becky as a hostile witness during the defense's case-in-chief. Lemaster's argument rest on his claim that Becky was biased against him, and because of her hostility toward the Petitioner and her motivation to benefit financially in the divorce proceedings, she manufactured a false rape charge against him. Furthermore, Petitioner argues that, if Mr. Cannon had called Becky, "the door would have been open to the presentation of testimony by Vicky Burt, Dr. Ken Counts,

Dewayne Howell, Lymon Henson, and others, all of whom had testimony to offer which supported Roger's theory." (DE # 41, p. 3)

Petitioner contends he proved at the evidentiary hearing that both prongs of the *Strickland* test are satisfied with respect to Mr. Cannon's failure to call Becky as a hostile witness. *Id.* Respondent argues that Petitioner has not demonstrated that his trial counsel's performance was deficient because he cannot, and did not, show the deficient performance and prejudice necessary to establish his claim under *Strickland.*

    A.    <u>Testimony at the Evidentiary Hearing</u>

        *1.    David Cannon*

Petitioner's habeas counsel called Mr. Cannon as the first witness. Mr. Cannon began his testimony by explaining what theory of defense he originally wanted to pursue on behalf of Lemaster. He explained that he planned to present that Lemaster had told Becky he wanted a divorce, and therefore in order to "get more" in the divorce, she devised a plan for her daughter to claim that she was raped by Lemaster. (DE # 36 at 3) Furthermore, he claims he intended to put on evidence that Becky and her children had nothing when they entered the marriage and that Becky was seeking Lemaster's premarital property in the divorce based on the rape charges. *Id.* at 6-7. Mr. Cannon candidly admitted this was his entire theory of defense until the trial judge advised him on the day of trial that he was not allowed to call witnesses on property issues because those issues were not relevant to the current rape case. *Id.* at 29.

Once the trial judge denied his argument that the testimony of the witnesses should be allowed in order to show bias on the part of Becky, as well as denying the proffer of such testimony, Mr. Cannon recalls announcing to the judge that he was not ready for trial. *Id.* More specifically, he stated the trial judge "basically gutted our defense there at the last minute" and that he needed

4

time to develop a new defense. *Id.* Lemaster's habeas counsel then asked Mr. Cannon if he remembered the trial judge commenting on the fact that he didn't call Becky for anything, not even to talk about motive, and pointed out that calling Becky "was something that you could have done." *Id.* at 33. While Mr. Cannon did not remember that specific quote from the trial judge, he did not dispute that it was said.

The most relevant portion of Mr. Cannon's testimony at the evidentiary hearing stemmed from counsel's questioning of Mr. Cannon's reasoning for not calling Becky as a hostile witness. As stated in this Court's previous order, the state court record was devoid of any trial strategy that Mr. Cannon could have had in deciding not to call Becky; thus, the need for the evidentiary hearing. The following colloquy took place between Petitioner's habeas counsel, Mr. Lambert, and Mr. Cannon:

> MR. LAMBERT: Now, would you make room for the possibility that if you had called Becky as a hostile witness, the door might have been opened for you to present some or perhaps all of this proof of her bias against Roger and the ill will and the, quote, gold digging that we've been talking about this morning?
>
> MR. CANNON: I believe by calling her as a hostile witness, there was a chance to open the door for a whole lot of stuff.
>
> MR. LAMBERT: All right. Can you elaborate on that?
>
> MR. CANNON: Well, obviously, as a hostile witness, she was not going to be favorable to Roger. She also would have – there was the possibility it could open the door for any number of things to come out of her mouth. So that's why I'm always leery of calling a hostile witness. But could she have opened the door to bring in the gold digger theory? It's possible, yes.
>
> MR. LAMBERT: What type of things were you afraid of that might have come out to Roger's detriment if you had called her?
>
> MR. CANNON: I don't remember off the top of my head, but there was so much acrimony between the two for, obviously, the divorce, these allegations, there's no telling what would have come out of her

mouth, and that's what scared me. There's an old adage, you don't call a witness unless you know what they're going to say and you don't ask a question that you don't already know the answer to. She was not being cooperative at all. And at least if I had the ability to cross-examine her, I think I might have been able to limit her, at least then the prosecutor would have been the one to open the door, rather than me.

MR. LAMBERT: So you would have preferred that the state called her then?

MR. CANNON: Yes.

MR. LAMBERT: All right. But by choosing not to call her as a defense witness, even a hostile witness, that shut down your –effectively shut down your ability to call anybody else, didn't it?

MR. CANNON: It shut down the ability to call a lot of people, like Dr. Counts, because he was mostly going to be an impeachment witness.

. . .

MR. LAMBERT: All right. But when you made that decision, you sacrificed –you sacrificed the testimony of all these other witnesses that you had there who were ready, willing, and able to testify about her bias and her gold digging, et cetera. Is that fair to say?

MR. CANNON: In part, yes. I sacrificed the ones that were going to be used to impeach her, but you can't really impeach your own witness until their credibility is attacked by the other side. So unless the state was going to attack the credibility of their own person, I haven't sacrificed anything. If the state had called her, then I could immediately, of course, attack her credibility. I can't call my own witness and then go ahead and attack their credibility until the state bolsters her credibility. Am I making my point? Because a lot of those people were called – subpoenaed to be there, assuming the state was going to call Becky as well, or they were going to call Becky to begin with.

. . .

MR. LAMBERT: All right. So when your defense was effectively shut down by the judge, what was going through your mind at that point? Did you have a plan B or –

MR. CANNON: Not really. At that point, it's a scramble. That's why I wanted to come up with a plan B. That's why I said I couldn't announce ready

>           for trial. But, of course, when she denied that, then it was a scramble
>           to come up with the best you can and do the best you can with what
>           you've been handed.

*Id.* at 35 - 40.

    *2.    Becky Boyett (previously "Lemaster")*

Becky Boyett, Lemaster's ex-wife, also testified at the evidentiary hearing. Becky testified that she worked for the unemployment office for the State of Arkansas when she and Lemaster first became romantically involved; that she lived in a camper on her mother's property; and that Lemaster had a business called R.C. Auto Detailing when she met him. *Id.* at 63-65. She testified that her marriage to Lemaster began to deteriorate in 2009, and readily admitted that their divorce proceedings were contentious. *Id.* at 65. When asked whether she had ever threatened to murder Lemaster, she stated that she had not threatened to murder him but did admit that she threatened many things during the entire process. *Id.* at 66. Becky stated that the caveat to her statements "was a scare tactic in order to get him to leave us alone." *Id.* at 67. She further stated that Lemaster "continuously harassed us, and he made death threats, his family made death threats through my phone, and I would tell anybody and everybody that would listen to me so they could get word back to him to leave us alone." *Id.*

When questioned regarding the timeline of when Lemaster filed for divorce and when the rape charges were filed, Becky stated she believes that Lemaster filed for divorce after he was arrested on the rape charges. *Id.* at 69. Becky denied being "behind" the rape charges in any way other than to ask her daughter if they were true, and when she told her that they were, Becky called the police and took her daughter to the police station to make a statement. *Id.* She also admitted to reporting Lemaster several times to the police when he violated the protective order that was put in place by the court. *Id.* at 71.

7

Regarding the auto detailing business, Becky admitted that she changed the name of the business to "K.B. Auto Detailing" in the spring of 2010. *Id.* at 71. Becky also stated that the business no longer had a viable place to be, because the city needed to put a parking lot in its location; therefore, the business closed. *Id.* at 80-81. When asked when Becky started seeing Keith Boyett, she admitted that she started seeing him before she and Lemaster were officially divorced. *Id.* at 73.

   3. *Roger Lemaster*

Lemaster testified at the evidentiary hearing over the objection of Pamela Rumpz, counsel for the Respondent. This Court allowed the testimony of Lemaster, however, it reiterated several times that it wanted his testimony to be limited to the issue of whether or not Lemaster's trial counsel was ineffective for failing to call Becky as a hostile witness. This Court has only considered the testimony it believes to be relevant to the issue for which the evidentiary hearing was held.

When asked what theory of the defense he wanted to pursue, Lemaster stated as follows: "[w]ell, we wanted to pursue that the only reason this even occurred at all was to get control of my business and my home, and that was the sole assumption of what we were going to court for. And I had every intention of making sure that that – everything was presented that could be presented that morning, until the judge just denied it all." *Id.* at 113. Regarding Mr. Cannon's decision not to call Becky, the following colloquy took place between Mr. Lambert and Lemaster:

| | |
|---|---|
| MR. LAMBERT: | Let's talk about the witnesses you wanted Mr. Cannon to call at your trial. First of all, did you discuss with him – did you have any discussions with him about calling Becky as a witness? |
| LEMASTER: | Yes. |

8

| | |
|---|---|
| MR. LAMBERT: | All right. When the trial judge basically shut you down, shut Mr. Cannon down, do you recall when that happened, right before the trial started? |
| LEMASTER: | Yes, sir. |
| MR. LAMBERT: | Were you sitting there at counsel table when all that happened? |
| LEMASTER: | Yes, sir. |
| MR. LAMBERT: | All right. Did you have any discussions with Mr. Cannon after that ruling was made by the trial court about what to do at that point? |
| LEMASTER: | No. |
| MR. LAMBERT: | When Mr. Cannon decided not to call Becky, were you in agreement with that decision? |
| LEMASTER: | No, I was not aware that that even occurred at all. I didn't know he had made that decision at all. |
| MR. LAMBERT: | Did you want him to call Becky as a hostile witness? |
| LEMASTER: | Absolutely, yes, sir. |

*Id.* at 136-37.

    B.    <u>Deficient Performance of Counsel</u>

In *Strickland v. Washington*, 466 U.S. 668 (1987), the United States Supreme Court recognized that the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. *Strickland* points out that it is tempting for a defendant to second-guess the assistance of counsel after a conviction, and easy for a court to determine that a decision of counsel was unreasonable after a defense has proven unsuccessful. *Id.* at 689. Instead, however, the Court held that "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

9

*Id.* Furthermore, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'." *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)).

It is clear from Mr. Cannon's testimony that the theory of defense he had prepared for Lemaster was severely limited on the day of trial when the court granted the state's motion in limine that virtually excluded all of the witness testimony Mr. Cannon intended to present in order to prove his theory of defense. While the trial judge stated that Mr. Cannon could call Becky as a witness, she made it clear that she did not intend to turn the trial into a divorce case. The state never called Becky Lemaster as a witness, and Mr. Cannon made the decision not to call Ms. Lemaster as a hostile witness.

After hearing the testimony of Mr. Cannon, as well as Becky, this Court does not believe it was unreasonable for Mr. Cannon to make the decision not to call Becky as a hostile witness. It was clearly strategy on the part of Mr. Cannon, and the Court finds that it was reasonable considering the circumstances and counsel's perspective at that time. Mr. Cannon was not able to speak to Becky prior to trial, and had no way of knowing what she would say if she were called as a hostile witness. The information that Mr. Cannon had before him was that Lemaster and Becky were going through a very acrimonious divorce, that there was much hostility between the two, and that she was not being cooperative at all. *Id.* at 36. At the evidentiary hearing, Becky admitted that her divorce proceedings were contentious because Lemaster "raped my child"; she made claims that Lemaster harassed her and her children; that he made death threats; that Lemaster's family made death threats; and that he violated the protective order put in place by the court numerous times. *Id.* at 65-71. Furthermore, Becky testified that there was a situation where she

had gone to the store and returned to find Lemaster zipping his pants and her daughter putting on her underwear. *Id.* at 85. She testified that, in hindsight, this was the first time she had some inkling there was possibly something improper going on between Lemaster and her daughter, but Lemaster explained that her daughter had simply had an accident, and he had just gone to the restroom. *Id.*

This Court finds that it was reasonable for Mr. Cannon not to call Becky as a hostile witness, but instead, adhering to what he termed the "old adage" – you don't call a witness unless you know what they are going to say and you don't ask a question that you don't already know the answer to. Given the circumstances, there is little question, that trial counsel's assistance and defense, was the result of reasonable professional judgment and not deficient under *Strickland.*

C. Prejudice

Since failure to make the required showing of either deficient performance or sufficient prejudice defeats an ineffective assistance of counsel claim, it is not necessary for the Court to examine whether Mr. Cannon's decision not to call Becky as a hostile witness prejudiced Lemaster. *See Strickland*, 466 U.S. at 697 (holding that a court need not address both components of the inquiry if a defendant makes an insufficient showing on one). However, even if the Court were to have found Mr. Cannon's performance to be deficient, it does not believe that any of the testimony or proffered testimony set forth at the evidentiary hearing showed with reasonable probability that had Becky testified at trial, the result of the proceeding would have been different.

**Certificate of Appealability**

When entering a final order adverse to the Petitioner, the Court must issue or deny a certificate of appealability. Rule 11 of the Rules Governing Section 2254 Cases in the United States District Court. The Court can issue a certificate of appealability only if Petitioner has made

a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). Petitioner has not provided a basis for issuing a certificate of appealability on the remaining issue in this case.

## Conclusion

Based on the foregoing, it is recommended that the instant habeas petition (DE #1) be denied and dismissed with prejudice and that a certificate of appealability be denied with regard to the remaining issue in this case.

SO ORDERED this 23rd day of May, 2017.

_____
UNITED STATES MAGISTRATE JUDGE